SO ORDERED: July 22, 2009.



Anthony J. Metz III
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE:<br>  RODNEY LEE PUGH AND<br>  CONNIE ELAINE PUGH,<br><br>        Debtors, | CASE NO. 07-662-AJM-7A |
| RICHARD BARTLETT,<br><br>        Plaintiff<br>vs.<br><br>RODNEY LEE PUGH & CONNIE ELAINE PUGH,<br><br>        Defendants | Adversary Proceeding<br>No. 07-50344 |

### FINDINGS OF FACT and CONCLUSIONS OF LAW

The Plaintiff, Richard Bartlett ("Bartlett"), filed his Complaint to Determine

Dischargeability of Debt on April 30, 2007 against Rodney and Connie Pugh, Defendants

1

("the Pughs"). The Pughs, in turn on October 23, 2007, filed a third party complaint against Robin Haun and Williams & Associates (the "Third Party Defendants"). Summary Judgment was entered in favor of the Third Party Defendants on November 6, 2008.

Trial on Bartlett's complaint was held on July 10, 2009 wherein the Plaintiff appeared in person and by counsel Mark Watson and Andrew Wilkerson; the Defendants appeared in person and by counsel Donald Thompson. At the conclusion of the trial, the Court, having considered the testimony of the witnesses, the arguments of counsel, and all the evidence admitted, ruled in favor of the Defendants and found that the debt owed to the Plaintiff by the Defendants was dischargeable. To supplement those verbal findings, the Court now makes its written findings of fact and conclusions of law in accordance with F. R Bankr. P. 7052.

## FINDINGS OF FACT

1. The dispute at issue in this proceeding arises from the July, 2005 sale of a 3.822 acre parcel of property located at 3103 W. County Road 1385 North, Rosedale, Indiana 47874 (the "Property").

2. Prior to April, 1999, the Property was part of a larger 63 acre tract (the "Master Tract") owned by John and Inez Dellacca (the "Dellaccas"). On April 5, 1999, the Dellaccas carved out the Property from the Master Tract and conveyed it to Virginia and Larry Walden (the "Waldens").

3. Rodney Pugh purchased the Property from the Waldens on December 30, 2003. Rodney believed that a wood frame barn and an old well, both of which were located on the west side of the Property, were contained within the Property's boundaries and therefore were included in the purchase from the Waldens. Upon

purchasing the Property from the Waldens, Rodney made full use of the old well and the barn.

4. When a neighbor questioned whether the old well was part of the Property, Rodney hired Deckard Engineering to survey the Property. That March 8, 2004 survey (the "Deckard Survey") indicated that the west property line was located approximately fifteen (15) feet further east than originally thought, and that it fell on the other side of the old well and cut through the wood frame barn. Thus, the Deckard Survey indicated that all of the old well and a portion of the wood frame barn were not located within the boundaries of the Property and therefore encroached upon the neighboring parcel not owned by Pugh.

5. On March 26, 2004, Virginia Walden paid to Rodney Pugh the sum of $5,000.00 and in return Rodney executed a general release of all claim he might have had against Walden, including but not limited to "the fact that certain improvements were thought by the Parties to be situated upon the [Property], when in fact not all of said improvements were located upon the [Property]". Rodney testified in the July 10th trial that he used the $5000 to dig a new well on the Property.

6. Rodney also testified that he took corrective steps to mark the boundaries of the Property in accordance with the Deckard Survey. He placed stakes on the north side of the barn and installed a new fence that ran from the road north of the barn to the barn. Both Rodney and Connie testified that they did not use or mow the land west of the new fence they had put up and that the old fence (which they thought was the original western boundary line to the Property) had not been

torn down. Weeds had grown on the land between the two fences and Rodney testified that they would have been visible to one looking west from the driveway. Connie Pugh testified that they marked the south side of the barn with orange paint. Connie also testified that she and Rodney did not use the old well or that portion of the barn which purportedly encroached upon the neighboring property after they learned the results of the Deckard Survey.

7. By January, 2005, the Pughs decided to sell the Property and on January 20, 2005, they entered into a Listing Contract and listed the Property with Robin Haun ("Haun") who was a real estate broker and an employee of Williams and Associates ("Williams").

8. Among the forms the Pughs signed was a Seller's Residential Real Estate Sales Disclosure Form (the "Disclosure Form"). The Disclosure Form stated, in part, "Seller states that the information contained in the Disclosure is correct to the best of Seller's CURRENT ACTUAL KNOWLEDGE as of the above date. . . . The representations in this form are the representations of the owner and are not the representations of the agent, if any." The Disclosure Form asked "Are there any encroachments?" In response, the box marked "NO" was checked. Rodney testified that he believed this question asked whether there were any encroachments from *other* property not owned by him encroaching *upon* his property, and that, since there were none, the answer "no" was accurate. Rodney also testified that he believed what was being offered for sale was what was contained in the Deckard Survey. At no time did the Pughs amend their Disclosure Form to include the information about the barn's encroachment

4

revealed by the Deckard Survey.

9. Sometime after the Disclosure Form was executed, the Pughs showed Haun the Property and both testified that they pointed out the west boundary to her. During this showing, Connie testified that she told Haun that a portion of the barn might encroach on the neighbor's property and might therefore need to be removed. Rodney testified that he offered to remove that portion of the barn that did not fall within the boundaries of the Property but that Haun told him it wasn't necessary as a potential buyer might want to remove it in a different way. Both Rodney and Connie testified that they offered to give Haun the Deckard Survey but Haun said she didn't want to lose it, and that she didn't need it, at least at that point.

10. Subsequently through Haun's efforts, Bartlett offered to purchase the Property. Bartlett testified that he understood that the property for sale was what was contained in the "fence lines" and that the only real discussion with Haun as to the property lines was Haun indicating to him that the barn might be "close" to the property line. Bartlett also testified that he did not see any orange marking on the south side of the barn. Bartlett asked Haun for the Deckard Survey and Haun said she had not yet received it but that she would try to get it for him.

11. At this point, both the old fence and the new fence installed by the Pughs (located 15 feet to the east of the old fence, in accordance with the Deckard Survey) were standing. When asked by the Court as to whether he questioned Haun about the new fence line, Bartlett responded that he wasn't looking at the new fence, and that he thought its function was only to enclose an area of pasture for the animals housed in the barn. Instead, Bartlett apparently assumed that the west boundary

of the Property was marked by the old fence, not the new fence installed by the Pughs.  Thus, according to Bartlett's understanding, the entire barn would be well within the Property's boundaries, albeit inconsistent with Haun's statement that the barn was "close" to the property line or that a portion of the barn might encroach upon the adjacent property.

12. The sale of the Property to Bartlett closed on July 22, 2005.  Both Rodney and Connie testified that neither had contact with Bartlett prior to the closing and that, it was not until immediately following the closing that Haun asked Connie to provide the Deckard Survey to Bartlett.  This was contrary to Haun's deposition testimony that she asked the Pughs for the Deckard Survey no less than four times before the closing. Rodney and Connie were not living together as of the closing, and, since Rodney had the Deckard Survey, Connie called him and asked him to give it to Bartlett.  Bartlett testified that he received the Deckard Survey anywhere from one to three months after the closing.  When he reviewed the survey, he noticed the property line "going through the barn" and testified that he would not have purchased the Property had he seen the Deckard Survey prior to closing. He also testified that neither Rodney nor Connie made any representations to him as to the true location of the Property's west boundary line and that any such representations in that regard were made to him by Haun.

13. The approximate 58 acres remaining of the Master Tract were conveyed to Jay and Kelly Swearingen (hereinafter "the Swearingens") on September 12, 2005, less than two months after the sale of the Property to Bartlett.  The Swearingens on January 8, 2007, sued Bartlett in the Clay Circuit Court for trepass and for

removal of the barn which encroached on their property (the "State Court Action").

14. Bartlett as third party plaintiff, in turn, on March 1, 2007, sued the Pughs in the State Court Action for damages and to reform the deed . The Pughs filed their voluntary petition for relief under chapter 7 of the Bankruptcy Code on January 31, 2007, prior to when they were sued as third party defendants in the State Court Action. As a result of the Pughs' bankruptcy filing, an Order Staying Proceedings as to the Pughs was entered in the State Court Action on April 27, 2007.

15, Bartlett commenced this adversary proceeding by filing his Complaint Objecting to Dischargeability of Particular Debt against the Pughs on April 30, 2007. The complaint alleges that Bartlett has suffered damages as a result of the State Court Action having been brought against him, and that such damages are nondischargeable under 11 U.S.C. §523 (a)(2) and (4) based on Pughs' alleged misrepresentation of the Property's description.

16. The Pughs, as Defendants, moved for summary judgment on Bartlett's nondischargeability claim. That motion for summary judgment was heard on October 8, 2008 and was denied on October 10, 2008.

17. On October 23, 2007, the Pughs filed a third-party complaint against Haun and Williams in this adversary proceeding, alleging that Haun and Williams were aware of the encroachment and that any false statements made to Bartlett with respect to the Property were made by Haun and Williams. Haun and Williams filed a counterclaim for breach of contract against the Pughs, seeking indemnification and damages. Summary Judgment was entered in favor of Haun and Williams and

against the Pughs on the third party complaint on November 6, 2008 on the basis that the Pughs' claim was barred by the statute of limitations.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of this action.

2. All findings of fact are incorporated by reference as conclusions of law, and all conclusions of law are incorporated by reference as findings of fact.

3. The Plaintiff alleges that the Debt is nondischargeable under §523(a)(2)(A). Under §523(a)(2)(A), an individual debtor shall not be allowed a discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud..." 11 U.S.C. § 523(a)(2).

4. Exceptions to discharge under §523 are "to be construed strictly against the creditor and liberally in favor of a debtor." *In re Scarlata*, 979 F.2d 521, 524 (7th Cir. 1992. A creditor that brings a §523 action seeking a determination of nondischargeability bears the burden of proving all the elements of the statute by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289-90; 111 S.Ct. 654, 661; 112 L.Ed.2d 755 (1991)

5. Section 523(a)(2)(A) list three separate grounds for dischargeability: actual fraud, false pretenses and false representation. Although many courts have applied the same test to all three grounds, the Seventh Circuit has distinguished between the three grounds and has formulated two different tests, one for the "false pretenses" and "false representation" grounds and another for the "actual fraud" ground. *In re Scarpello*, 272 B.R. 691, 699-700 (Bankr. N. D. Ill. 2002); citing *McClellan v.*

     *Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000).

6. To prevail on a nondischargeability claim under the "false pretenses" or "false representation" grounds set forth in §523(a)(2)(A), a creditor must prove *all* of the following elements: (1) the debtor obtained money, property or services through representations which the debtor either knew to be false or made with such reckless disregard for the truth as constitute a willful misrepresentation; (2) the debtor possessed scienter, i.e. an intent to deceive; and (3) the creditor justifiably relied on the false representation to his detriment. *Scarpello*, 272 B.R. at 700.

7. A misrepresentation can occur not just though a verbal representation, but also through a debtor's conduct that was intended to create a false impression, but the representation – regardless in what form made – must be with respect to a material fact. *Scarpello*, 272 B.R. at 700.

8. Proof of intent to deceive is determined by a review of all of the relevant factors of the particular case and is measured by the debtor's subjective intention *at the time the representation was made*. Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive. *Mayer v Spanel International, Ltd (Matter of Mayer),* 51 F.3d 670, 673 (7th Cir. 1995); *Bletnitsky v. Jairath (In re Jairath),* 259 B.R. 308, 314 (Bankr. N. D. Ill. 2001).

9. Reliance on the false pretense or false representation must be justifiable, which at least one court has described as an "intermediate level of reliance". *Scarpello*, 272 B.R. at 700. This intermediate level of reliance "imposes no duty to

      investigate unless the falsity of the representation is readily apparent". *Scarpello*, 272 B.R. at 700. Whether there was justifiable reliance by the creditor is measured by a subjective standard; that is, the creditor must show that the debtor "made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge." *Scarpello*, 272 B.R. at 700; *Mayer*, 51 F.3d at 676.

10.   A slightly different test is used where the creditor alleges the debt is nondischargeable under the "actual fraud" part of §523(a)(2)(A). In such cases, a creditor must prove (1) a fraud occurred; (2) the debtor was guilty of intent to defraud; and (3) the fraud created the debt that is the subject of the nondischargeability action. *McClellan*, 217 F.3d at 893; *Scarpello*, 272 B. R. at 701. Noteworthy is the fact that "actual fraud" is not limited to misrepresentation, and therefore, to state a claim under the "actual fraud" prong of §523(a)(2)(A), one need *not* allege misrepresentation and reliance thereon. *McClellan*, 217 F.3d at 893; *Scarpello*, 272 B.R. 701.

11.   The evidence is undisputed that the Pughs made no direct statements or representations to Bartlett about the Property and that any statements made to Bartlett were made by Haun. The Pughs voluntarily disclosed to Haun, their real estate agent, that there was a possible encroachment involving part of the west side of the barn and the land west of the barn to the fence. The Pughs also informed Haun that they had the Deckard Survey and offered to give it to her. They offered to remove the portion of the barn that possibly encroached on the

adjoining property. They also marked off the Property by constructing a fence on the north side of the barn and painting an orange line to the south of the barn. Such actions are not consistent with one who has the intent to deceive.

12. As to the "no encroachments" response on the Disclosure Form, Rodney testified that he read the form to ask if there were any encroachments by an adjacent parcel upon his property -- the Property to be sold -- not whether any part of the Property to be sold encroached upon an adjacent parcel. Given this interpretation of the question, Rodney's response on the Disclosure Form was correct; he just misunderstood the question.

13. Most importantly, the evidence is undisputed that, even if the Pughs did make any false representations with respect to the Property, Bartlett did not rely on them. Bartlett testified that he did not rely -- either before or at the closing --  on any information contained in the Disclosure Form or any other statement executed by the Pughs in connection with the sale of the Property. Bartlett could have requested that the closing not occur until after he received and reviewed the Deckard Survey; he chose not to do so. Bartlett's reliance on the general description of the property lines was supplied by Haun, but even that reliance was unreasonable. Furthermore, the unmaintained portion of the property between the new fence and the old fence was visible from the Pughs' driveway.
Haun had told him that may have been some issue with the west boundary line in that it may come up to or cut through a portion of the barn. The only fence line located at or near the barn was the new fence line constructed by the Pughs. The old fence line was fifteen feet to the west of the barn. At the very least,

11

        Haun's disclosure should have given Bartlett pause as to the correct property line since both the old fence and the new fence existed when he viewed the Property.

14. Finally, there is evidence that there is no encroachment issue with the Property sold to Bartlett after all.  Registered land surveyor William Mac Steele testified at trial that he conducted a survey of the Property on Bartlett's behalf on August 20, 2007 (the "Steele Survey").  The Steele Survey was conducted in accordance with the Indiana survey standards and shows that the 3.8 acres conveyed by the Pughs to Bartlett includes the entire barn and the land between the barn and the fence to the west.  Steele further testified that the Deckard Survey was erroneous because its point of beginning was incorrect.  No representative of Deckard Engineering nor any other witness was called to testify as to the accuracy of the Deckard Survey and there was no evidence presented that challenged the Steele Survey.  Accordingly, the survey conducted at Bartlett's own request fails to establish that the Pughs made any false representations to him or that he, as a result, suffered any damages.   Bartlett has failed to meet his burden of proof with respect to his §523(a)(2)(A) claim, and the debt is dischargeable under that section.

### *Nondischargeability under §523(a)(4)*

15. Bartlett's complaint also alleges nondischargeability under Section 523(a)(4) which renders nondischargeable those debts resulting from fraud or defalcation while acting in a fiduciary capacity, or debts resulting from embezzlement or larceny.  There are alternate routes of recovery under this section: a debt is

12

nondischargeable under this section if the plaintiff can prove: (a) a fiduciary relationship existed between the debtor and the plaintiff and that the debt arose out of fraud or defalcation while acting in that fiduciary capacity *or* (b) the debt resulted from embezzlement or larceny.

16. No evidence exists in the record to suggest that the Pughs owed Bartlett a fiduciary duty and committed fraud or defalcation while acting in that fiduciary capacity. Nor does evidence exist that the Pughs committed embezzlement or larceny. The debt is dischargeable under §523(a)(4).

17. The debt owed by the Pughs to Bartlett is dischargeable under both §§523(a)(2)(A) and (4). The Court will enter judgment in favor of the Defendants.

### # # #

Distribution:
Donald Thompson, Attorney for Connie and Rodney Pugh, Defendants
Mark E. Watson / Andrew Wilkerson, Attorneys for Richard Bartlett, Plaintiff
Nancy J. Gargula, United States Trustee